# EXHIBIT 1

IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA

DAVID DRYSDALE, an individual, and L. JOHN ARBIZZANI, as Trustee of the L. JOHN ARBIZZANI REVOCABLE TRUST 2001,

CASE NO.: **CA23-1796**

     Plaintiffs,

v.

AUTOMATED CLINICAL GUIDELINES, LLC, a Florida limited liability company, DOUGLAS K. DEW, M.D., an individual, and DOUGLAS DEW, JR., an individual,

     Defendants.

_____/

## COMPLAINT

Plaintiffs, David Drysdale ("Mr. Drysdale") and L. John Arbizzani, as Trustee of the L. John Arbizzani Revocable Trust 2001 ("Mr. Arbizzani"), sue Defendants, Automated Clinical Guidelines, LLC ("ACG"), Douglas K. Dew, M.D. ("Dr. Dew"), and Douglas "Dewey" Dew, Jr. ("Mr. Dew") and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Mr. Drysdale, is an individual who resides in St. Johns County, Florida. Mr. Drysdale is 75 years old and is entitled to a civil speedy trial in accord with Section 415.1115, Florida Statutes.

2.     Plaintiff, Mr. Arbizzani, is an individual who resides in St. Johns County, Florida. Mr. Arbizzani is 78 years old and is entitled to a civil speedy trial in accord with Section 415.1115, Florida Statutes.

3.     Defendant, ACG, is a Florida limited liability company, with a principal place of business located at 201 Health Park Boulevard, Suite 101, St. Augustine, St. Johns County, Florida 32080.

4.     Defendant, Dr. Dew, is an individual who resides in Flagler County, Florida.

5.     Defendant, Mr. Dew, is an individual who resides in Flagler County, Florida.

6.     This Court has subject matter jurisdiction over this action because it is an action seeking equitable relief and damages in excess of $50,000.00, exclusive of interest, costs, and attorneys' fees.

7.     Venue is proper in St. Johns County because, *inter alia*, it is where ACG maintains a principal place of business, and it is where one or more of the causes of action alleged herein accrued.

8.     All conditions precedent to the maintenance of the causes of action alleged herein have been complied with, have occurred in fact or by operation of law, or have been waived.

## GENERAL ALLEGATIONS

9.     At all times material here to, ACG has claimed to be in the business of developing and providing a web based artificial intelligence clinical tool to assist physicians in their diagnosis and treatment of illnesses.

10.    Dr. Dew is a physician and the founding Member of ACG as well as its Chief Executive Officer.

11.    Mr. Dew is a Member of and equity investor in ACG as well as an officer of ACG.

12.    As set forth more particularly below, ACG, Dr. Dew, and Mr. Dew schemed to and did defraud Mr. Drysdale and Mr. Arbizzani into investing in ACG through Dr. Dew's and Mr. Dew's knowing misrepresentations of fact.

13.     In August 2020, Defendants approached Mr. Drysdale and Mr. Arbizzani asking them to invest in ACG.  Defendants represented to Mr. Drysdale and Mr. Arbizzani that ACG owned an issued United States patent in its artificial intelligence computer technology that was going to be very lucrative in the medical field, and that he was looking for passive investors in his company. At that time, both Mr. Drysdale and Mr. Arbizzani knew Dr. Dew was a local practicing physician, and Dr. Dew had discussed with both Plaintiffs his valuable art collection, his ocean front estate and other trappings of affluence which all added to the illusion of ACG's being a successful start up in the health care field.

14.     In August 2020, Dr. Dew and Mr. Dew, on behalf of themselves and ACG, in order to induce Mr. Drysdale's and Mr. Arbizzani's investment, provided the purported financial statements of ACG to Mr. Drysdale and Mr. Arbizzani to include its asset and balance sheet.  A true and correct duplicate of ACG's Balance Sheet as of December 31, 2019 that Dr. Dew and Mr. Dew provided to Mr. Drysdale and Mr. Arbizzani in August 2020 is attached hereto as **Exhibit "A."** The ACG balance sheet Dr. Dew and Mr. Dew provided to Mr. Drysdale and Mr. Arbizzani reflects a "patent" as the most valuable asset of the company at a precise value of a $5,043,340.65.

15.     Unfortunately, the ACG balance sheet was materially false, untrue, and misleading in several distinct ways. To begin with, as of August 2020, the United States Patent and Trademark Office had not issued ACG a patent on its technology. In August 2020, all ACG owned was an application for a patent. Dr. Dew and Mr. Dew knew that ACG did not have an issued patent in August 2020.

16.     More problematically, in August 2020, the United States Patent and Trademark Office had already rejected ACG's patent *application* on two separate prior occasions. Thus, not only did ACG only own a patent application in August 2020, the United States Patent and

Trademark Office had already rejected the application for issuance of the patent on two separate prior occasions, a fact known to Dr. Dew and Mr. Dew. Since August 2020, the United States Patent and Trademark Office has rejected the patent application another four times for a total of six rejections (which would make any patent on this technology if ever issued so narrow as to be easily non infringed making any resulting patent near worthless)—again facts known to Dr. Dew and Mr. Dew. Instead of ever disclosing any of this history to Mr. Drysdale and Mr. Arbizzani, Dr. Dew and Mr. Dew actively concealed the truth and consistently represented that ACG owned a valid United States Patent with a value in excess of $5,000,000.

17.     As part of their fraud, Dr. Dew, Mr. Dew, and ACG included a valid extant patent on ACG's balance sheets (to include the December 2019 sheet Defendants used to solicit Mr. Drysdale's and Mr. Arbizzani's investment) at a value of $5,043,340.65. The precision of this number was materially misleading in its implicit suggestion to anyone reading the financial statements that some legitimate financial analysis and methodology must have occurred in setting the value of this "asset". To the contrary, this "valuation" was part of the fraud. Defendants arbitrarily picked this value with no recognized financial methodology for the valuation of intellectual property, gave Dr. Dew and Mr. Dew credit for the contribution of this value to ACG such that it inflated the percentage of their ownership interests in the company and served to justify a share price at $10 per share for the $200,000 Defendants asked Mr. Drysdale and Mr. Arbizzani to each invest. That is, this "valuation" was part of Defendants' cooking of the books to justify the unit price for the investments Defendants were inducing Mr. Drysdale and Mr. Arbizzani to make.

18.     Moreover, on a Thursday or Friday in early August 2020, Dr. Dew and Mr. Dew told both Mr. Drysdale and Mr. Arbizzani that they needed to make their investments within a few days, as Defendants had another investor who was investing $25,000,000.00 into the company the

following Monday and that capital infusion would cause any investments made after the following Tuesday to be priced at $20 per share. Thus, Dr. Dew and Mr. Dew created a false sense of urgency falsely leading Mr. Drysdale and Mr. Arbizzani to believe that their investment would only be worth half as much units of ownership interest in the company if they did not make their investments by that Monday. Dr. Dew and Mr. Dew, however, knew these representations were false statements when they made them to Mr. Drysdale and Mr. Arbizzani. Not only did no such investor make the $25,000,000.00 investment but at the time Dr. Dew and Mr. Dew made these inducements to Mr. Drysdale and Mr. Arbizzani, they knew that no such investor was putting $25,000,000.00 into the company the following week.

19. Further, at no time prior to their investment did Defendants disclose to either Mr. Drysdale or Mr. Arbizzani that there were effectively multiple classes of members such that Dr. Dew, Mr. Dew, and another Dew family member, Dylan Dew, would be receiving minimum distributions without regard to the existence of net revenue and without pro rata distributions being made to the non-Dew family investors such as Mr. Drysdale and Mr. Arbizzani. Indeed, ACG's operating agreement which Dr. Dew and Mr. Dew provided to Mr. Drysdale and Mr. Arbizzani shows just the opposite. It reflects that all members were the same and distributions would only be made from net revenues pro rata based upon each members' overall share of the company.

20. Nonetheless, Mr. Drysdale and Mr. Arbizzani have since learned that ACG has been paying "member guaranteed minimum payments" to certain equity investors, to the exclusion of other investors. Those equity investors are comprised of Dr. Dew, Mr. Dew, and Dylan Dew. ACG made "member guaranteed payments" of $300,000.00 in 2020 and $210,000.00 in 2021, while the gross revenue for 2020 was only $80,000.00 and the gross revenue for 2021 was $0.00.

As such, Defendants were necessarily using Mr. Drysdale's and Mr. Arbizzani's investments to pay out "distributions" to Dew family member equity holders.

21.     This self-dealing is not authorized or reflected in ACG's Operating Agreement. Moreover, such distributions were even more problematic as that may have minimized the K-1 losses being attributed to the non-Dew family investors while providing tax advantages to the Dew family members receiving these distributions. The undisclosed self-dealing that is inherent in the "member guaranteed minimum payments" was a material omission and part of the overall fraud on Mr. Drysdale and Mr. Arbizzani.

22.     Finally, prior to purchasing shares in AGC, Defendants provided Mr. Drysdale and Mr. Arbizzani with projections showing future revenue beginning in Year 1 of $300,000, then increasing to $7,500,000 in Year 2, $75,000,000 in Year 3, $150,000,000 in Year 4, and $300,000,000 in Year 5.   A copy of these projections are attached hereto as **Exhibit "B."** Defendants' representations in this regard were false.   Defendants intentionally inflated the projected future revenues, knowing that, in fact, they were off in their "projections" by orders of magnitude in the thousands.   Defendants knew there was no reasonable basis for these revenue targets when ACG did not own a patent in its artificial intelligence computer technology, had no orders for sales that would justify these revenues, and that Dr. Dew and Mr. Dew would instead use investors' investments to pay out "distributions" to themselves and their family members despite having no net revenues to justify any distributions.   Defendants did so in order to falsely represent to Mr. Drysdale and Mr. Arbizzani that investment in ACG would generate substantial returns.

23.     Based upon Defendants' material misrepresentations and omissions, on August 10, 2020, Mr. Drysdale and Mr. Arbizzani each invested $200,000.00 in ACG by purchasing 20,000 shares in ACG at $10.00 per share.

24.     If Mr. Drysdale or Mr. Arbizzani had known the truth of these matters, neither would have made their $200,000 investment in ACG.

25.     Upon their noticing that the revenues of ACG in 2020 were $80,000.00 and in 2021 were $0.00, Mr. Drysdale and Mr. Arbizanni began pressing Dr. Dew for answers and began investigating the truth of the matters surrounding ACG.  In these last few months, Plaintiffs have begun to discover the truth of the frauds Dr. Dew, Mr. Dew, and ACG perpetrated.

26.     Mr. Drysdale and Mr. Arbizzani have retained the law firm of Smith, Gambrell & Russell, LLP, to represent them in this action, and are obligated to pay the undersigned reasonable attorneys' fees for their services.

### COUNT I
### VIOLATION OF THE FLORIDA SECURITIES INVESTOR PROTECTION ACT, SECTION 517.301, FLORIDA STATUTES

27.     Mr. Drysdale and Mr. Arbizzani re-allege paragraphs 1–26 as if fully set forth herein.

28.     This is an action for the equitable remedy of rescission of Mr. Drysdale's and Mr. Arbizzani's investments based on Defendants' violation of Florida's Securities and Investor Protection Act, Section 517.301, Florida Statues.

29.     Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Mr. Drysdale and Mr. Arbizzani relating to the offer and sale of securities (i.e., the 20,000 shares in ACG) induced Mr. Drysdale and Mr. Arbizzani to invest $200,000 each in ACG.

30.     Defendants' intentional misrepresentations included, but were not limited to: (1) that the patent had been issued, when in fact, at the time of Mr. Drysdale's and Mr. Arbizzani's investment, the United States Patent and Trademark Office had already rejected ACG's patent *application* on two separate occasions, (2) that the value of the "issued" patent was $5,043,340.65, when in fact, Defendants arbitrarily picked this value with no recognized financial methodology for the valuation of intellectual property, thus creating the appearance of a legitimate issued patent, and also serving to justify a share price at $10 per share, and (3) that Mr. Drysdale and Mr. Arbizzani needed to make their investment within a few days, as Dr. Dew and Mr. Dew had another investor who was putting $25,000,000.00 into the company the following week and that this would cause any investments made after the following week to be priced at $20 per share based upon the new value of ACG after this significant capital infusion.

31.     Defendants' intentional material omissions included, but were not limited to, their failure to disclose that there were effectively multiple classes of members such that Dew family would be receiving guaranteed minimum distributions without regard to the existence of net revenue and without pro rata distributions being made to the non-Dew family investors.

32.     Defendants' material representations to Mr. Drysdale and Mr. Arbizzani were untrue, and Defendants concealed material facts from Mr. Drysdale and Mr. Arbizzani.

33.     The Defendants' untrue statements of material facts and omissions alleged herein were made with the intention of inducing, and did thereby induce, Mr. Drysdale and Mr. Arbizzani to purchase the shares of ACG.

34.     Defendants knew that Mr. Drysdale and Mr. Arbizzani relied upon their material misrepresentations and omissions in making the decision to invest $200,000 each in ACG.

35.     In reasonable reliance on Defendants' misrepresentations and concealment, Mr. Drysdale and Mr. Arbizzani each invested $200,000 in ACG on August 10, 2020.

36.     Mr. Drysdale and Mr. Arbizzani would not have agreed to purchase the securities and invest in ACG but for Defendants' misleading statements and failure to disclose material facts.

37.     Defendants' material misstatements and omissions were committed with scienter, as Defendants knew the patent had not been issued, had been twice rejected at the time they provided plaintiffs with their financial statements, and that the patent could not possibly be valued at $5,043,340.65. Defendants repeatedly and intentionally misrepresented that the patent had been issued and that a large capital infusion was forthcoming in order to induce Mr. Drysdale and Mr. Arbizzani to invest so that Defendants could use the investment funds for their own personal uses, i.e., payment of member minimum payments to Dr. Dew, Mr. Dew, and Dylan Dew as alleged above. Defendants' scienter is further demonstrated by Defendants' concealment of their fraud, and failure to inform Mr. Drysdale and Mr. Arbizzani of the repeated rejections of the patent following Mr. Drysdale's and Mr. Arbizzani's investment.

38.     As a direct and proximate result of Defendants' wrongful conduct and violations of Section 517.301, Florida Statutes, Mr. Drysdale and Mr. Arbizzani suffered damages in connection with the purchase of their shares in ACG. As alleged herein, each Defendant directly participated in the fraudulent sale of shares in ACG to Mr. Drysdale and Mr. Arbizzani, and therefore Defendants are jointly and severally liable to Mr. Drysdale and Mr. Arbizzani pursuant to Section 517.211(2), Florida Statutes.

39.     Pursuant to Section 517.211(2)–(3)(a), Florida Statutes, Mr. Drysdale and Mr. Arbizzani are entitled to rescission of their investments to include recovery of the consideration paid for their investment, plus interest thereon at the legal rate.

40.     Mr. Drysdale and Mr. Arbizzani are further entitled to recover attorneys' fees pursuant to Section 517.211(6), Florida Statutes.

WHEREFORE, Plaintiffs, David Drysdale and L. John Arbizzani, as Trustee of the L. John Arbizzani Revocable Trust 2001, request that the Court enter judgment in favor of each of them against Defendants jointly and severally for the $200,000 each Plaintiff invested, together with prejudgment interest thereon, Plaintiffs' attorneys' fees and costs, together with post judgment interest until paid and for such other and further relief as the Court deems just and proper.

<u>COUNT II</u>
<u>VIOLATION OF SECTION 10(B) OF THE</u>
<u>1934 SECURITIES AND EXCHANGE ACT AND RULE 10B-5 (17 C.F.R. § 240.10B-5)</u>

41.     Mr. Drysdale and Mr. Arbizzani re-allege paragraphs 1–26 as if fully set forth herein.

42.     This is an action for the equitable remedy of rescission of Mr. Drysdale's and Mr. Arbizzani's investments based on Defendants' violation of Section 10(b) of the 1934 Securities and Exchange Act and Rule 10b-5 promulgated by the United States Securities and Exchange Commission, codified at 17 C.F.R. § 240.10b-5.

43.     Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Mr. Drysdale and Mr. Arbizzani relating to the offer and sale of securities (i.e., the 20,000 shares in ACG) induced Mr. Drysdale and Mr. Arbizzani to invest $200,000 each in ACG.

44.     The investment Dr. Dew and Mr. Dew were soliciting from Mr. Drysdale and Mr. Arbizanni was a sale of securities under applicable federal law in that it was for an investment of money in a common enterprise with a reasonable expectation of profits to be derived from others.

45.     In relation to the sale of securities, Defendants used means or instrumentalities of interstate commerce, including but not limited to email and telephone communications and the internet, to engage in acts, practices or courses of business which operated as a fraud and deceit upon Mr. Drysdale and Mr. Arbizzani.

46.     Defendants' intentional misrepresentations included, but were not limited to: (1) that the patent had been issued, when in fact, at the time of Mr. Drysdale's and Mr. Arbizzani's investment, the United States Patent and Trademark Office had already rejected ACG's patent *application* on two separate occasions, (2) that the value of the "issued" patent was $5,043,340.65, when in fact, Defendants arbitrarily picked this value with no recognized financial methodology for the valuation of intellectual property, thus creating the appearance of a legitimate issued patent, and also serving to justify a share price at $10 per share, and (3) that Mr. Drysdale and Mr. Arbizzani needed to make their investment within a few days, as Dr. Dew and Mr. Dew had another investor who was putting $25,000,000.00 into the company the following week and that this would cause any investments made after the following week to be priced at $20 per share based upon the new value of ACG after this significant capital infusion.

47.     Defendants' intentional material omissions included, but were not limited to their failure to disclose that there were effectively multiple classes of members such that Dew family equity holders would be receiving minimum distributions without regard to the existence of net revenue and without pro rata distributions being made to the non-Dew family investors.

48.     Defendants' material representations to Mr. Drysdale and Mr. Arbizzani were untrue, and Defendants' omissions of material facts were necessary so that Defendants' misrepresentations to Mr. Drysdale and Mr. Arbizzani appeared to be not misleading.

49.     The Defendants' untrue statements of material facts and omissions alleged herein were made with the intention of inducing, and did thereby induce, Mr. Drysdale and Mr. Arbizzani to purchase the shares of ACG.

50.     Defendants knew that Mr. Drysdale and Mr. Arbizzani relied upon their material misrepresentations and omissions in making the decision to invest $200,000 each in ACG.

51.     In reasonable reliance on Defendants' misrepresentations and concealment, Mr. Drysdale and Mr. Arbizzani each invested $200,000 in ACG on August 10, 2020.

52.     Mr. Drysdale and Mr. Arbizzani would not have agreed to purchase the securities and invest in ACG but for Defendants' misleading statements and failure to disclose material facts.

53.     Defendants' material misstatements and omissions were committed with scienter, as Defendants knew the patent had not been issued, and that the patent could not possibly be valued at $5,043,340.65.  Defendants repeatedly and intentionally misrepresented that the patent had been issued and that a large capital infusion was forthcoming in order to induce Mr. Drysdale and Mr. Arbizzani to invest so that Defendants could use the investment funds for their own personal uses, i.e., payment of member minimum payments to Dr. Dew, Mr. Dew, and Dylan Dew as alleged above. Defendants' scienter is further demonstrated by Defendants' concealment of their fraud, and failure to inform Mr. Drysdale and Mr. Arbizzani of the repeated rejections of the patent following Mr. Drysdale's and Mr. Arbizzani's investment.

54.     As a direct and proximate result of Defendants' intentional wrongful conduct, Mr. Drysdale and Mr. Arbizzani suffered damages in connection with the purchase of securities (i.e., the shares) in ACG.

WHEREFORE, Plaintiffs, David Drysdale and L. John Arbizzani, as Trustee of the L. John Arbizzani Revocable Trust 2001, request that the Court enter an Order rescinding Plaintiffs'

investments and requiring Defendants to return the $200,000 paid to them, together with pre and post judgment interest, taxable Court costs, and for such other and further relief as the Court deems just and proper.

**COUNT III**
**COMMON LAW FRAUD IN THE INDUCEMENT**

55.     Mr. Drysdale and Mr. Arbizzani re-allege paragraphs 1–26 as if fully set forth herein.

56.     This is an action for common law fraud in the inducement.

57.     Defendants made false statements of material facts to Mr. Drysdale and Mr. Arbizzani, including but not limited to: (1) that the patent had been issued, when in fact, at the time of Mr. Drysdale's and Mr. Arbizzani's investment, the United States Patent and Trademark Office had already rejected ACG's patent *application* on two separate occasions, (2) that the value of the "issued" patent was $5,043,340.65, when in fact, Defendants arbitrarily picked this value with no recognized financial methodology for the valuation of intellectual property, thus creating the appearance of a legitimate issued patent, and also serving to justify a share price at $10 per share, and (3) that Mr. Drysdale and Mr. Arbizzani needed to make their investment within a few days, as Dr. Dew and Mr. Dew had another investor who was putting $25,000,000.00 into the company the following week and that this would cause any investments made after the following week to be priced at $20 per share based upon the new value of ACG after this significant capital infusion.   Defendants' representations concerned matters material to Mr. Drysdale and Mr. Arbizzani. For example, the difference between owning an issued patent and merely having applied for one (let alone having applied for one which had been rejected twice) is material.  Had Mr. Drysdale and Mr. Arbizzani known that Defendants did not actually have a patent, Plaintiffs would not have invested in ACG.

58.     Defendants' intentional material omissions included, but were not limited to, their failure to disclose that there were effectively multiple classes of members such that Dew family equity holders would be receiving guaranteed minimum distributions without regard to the existence of net revenue and without pro rata distributions being made to the non-Dew family investors.

59.     Each of the above representations were false and Defendants knew the statements were false at the time they made them to Mr. Drysdale and Mr. Arbizzani. For example, Defendants knew the patent had not been issued, and that the patent could not possibly be valued at $5,043,340.6.  Defendants repeatedly and intentionally misrepresented that the patent had been issued and that a large capital infusion was forthcoming in order to induce Mr. Drysdale and Mr. Arbizzani to invest so that Defendants could use the investment funds for their own personal uses, i.e., payment of member minimum payments to Dr. Dew, Mr. Dew, and Dylan Dew as alleged above. Defendants' scienter is further demonstrated by Defendants' concealment of their fraud, and failure to inform Mr. Drysdale and Mr. Arbizzani of the repeated rejections of the patent following Mr. Drysdale's and Mr. Arbizzani's investment.

60.     By making the above statements to Mr. Drysdale and Mr. Arbizzani, Defendants intended to, and did in fact, induce Plaintiffs into investing $200,000 each in ACG.

61.     Mr. Drysdale and Mr. Arbizzani reasonably relied on these representations by, among things, making their $200,000.00 investments.

62.     As a result of their reasonable reliance upon Defendants' material misrepresentations, Mr. Drysdale and Mr. Arbizzani have been damaged, and continue to suffer damage, including, but not limited to, loss of their $200,000 investment each.

63.     As detailed herein, the Defendants have engaged in intentionally wrongful conduct in reckless disregard for the rights of Mr. Drysdale and Mr. Arbizzani, and Mr. Drysdale and Mr. Arbizzani hereby reserve the right to amend this Complaint to assert appropriate claims for punitive damages upon making their proffer.

WHEREFORE, Plaintiffs David Drysdale and L. John Arbizzani, as Trustee of the L. John Arbizzani Revocable Trust 2001, demand judgment against Defendants jointly and severally for all of their damages, including pre and post judgment interest, taxable Court costs, and any further relief this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs David Drysdale and L. John Arbizzani, as Trustee of the L. John Arbizzani Revocable Trust 2001, request trial by jury on all issues so triable.

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Cassandra R. Daum*_____
ALAN S. WACHS
Florida Bar No.: 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dsmith@sgrlaw.com
JAMES R. MCCACHREN
Florida Bar No.: 986585
jmccachren@sgrlaw.com
dcote@sgrlaw.com
CASSANDRA R. DAUM
Florida Bar No. 1002721
cdaum@sgrlaw.com
asalane@sgrlaw.com
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
(904) 598-6110 (Telephone)
(904) 598-6210 (Facsimile)

*Attorneys for Plaintiffs*

# EXHIBIT A

# Automated Clinical Guidelines, LLC
## Balance Sheet
### As of December 31, 2019

|  | Dec 31, 19 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| SunTrust Checking #9865 | 341,071.35 |
| SunTrust MM #0330 | 484.63 |
| **Total Checking/Savings** | 341,555.98 |
| **Other Current Assets** | |
| Loan-MDPA | 297,714.96 |
| **Total Other Current Assets** | 297,714.96 |
| **Total Current Assets** | 639,270.94 |
| **Fixed Assets** | |
| Furniture and Equipment | 9,350.46 |
| Accumulated Depreciation | -9,244.09 |
| **Total Fixed Assets** | 106.37 |
| **Other Assets** | |
| Security Deposits | 1,000.00 |
| U.S. Patent-Filed 2/15/2008 | 5,043,340.65 |
| Start-Up Costs | 13,790.07 |
| Organization Costs | 1,409.87 |
| **Total Other Assets** | 5,059,540.59 |
| **TOTAL ASSETS** | **5,698,917.90** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Long Term Liabilities** | |
| Member Loans | 1,433,434.74 |
| **Total Long Term Liabilities** | 1,433,434.74 |
| **Total Liabilities** | 1,433,434.74 |
| **Equity** | 4,265,483.16 |
| **TOTAL LIABILITIES & EQUITY** | **5,698,917.90** |

# Automated Clinical Guidelines, LLC
# Balance Sheet
## As of December 31, 2019

|  | Dec 31, 19 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| SunTrust Checking #9865 | 341,071.35 |
| SunTrust MM #0330 | 484.63 |
| **Total Checking/Savings** | 341,555.98 |
| **Other Current Assets** | |
| Loan-MDPA | 297,714.96 |
| **Total Other Current Assets** | 297,714.96 |
| **Total Current Assets** | 639,270.94 |
| **Fixed Assets** | |
| Furniture and Equipment | 9,350.46 |
| Accumulated Depreciation | -9,244.09 |
| **Total Fixed Assets** | 106.37 |
| **Other Assets** | |
| Security Deposits | 1,000.00 |
| U.S. Patent-Filed 2/15/2008 | 5,043,340.65 |
| Start-Up Costs | 13,790.07 |
| Organization Costs | 1,409.87 |
| **Total Other Assets** | 5,059,540.59 |
| **TOTAL ASSETS** | **5,698,917.90** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Long Term Liabilities** | |
| **Member Loans** | |
| **Member Loan-DK Dew** | 908,437.09 |
| **Member Loan-DK Dew Jr** | 274,549.78 |
| **Member Loan-Dylan Dew** | 250,447.87 |
| **Total Member Loans** | 1,433,434.74 |
| **Total Long Term Liabilities** | 1,433,434.74 |
| **Total Liabilities** | 1,433,434.74 |
| **Equity** | |
|  | 556,738.70 |
|  | 556,722.70 |
|  | 556,727.70 |
|  | 556,727.70 |
|  | 556,726.70 |
|  | 143,217.86 |
|  | 69,518.93 |
|  | 111,360.63 |
|  | 116,653.78 |
|  | 91,610.62 |
|  | 230,630.55 |
|  | 71,132.31 |
|  | 234,802.55 |
|  | 676,725.73 |
|  | 110,432.12 |
|  | 94,398.63 |
|  | 50,308.32 |
|  | 100,616.63 |
|  | 24,539.16 |
|  | 24,642.89 |
|  | 24,539.15 |
|  | 9,898.64 |
|  | 74,239.86 |
|  | 9,898.65 |

# Automated Clinical Guidelines, LLC
# Balance Sheet
## As of December 31, 2019

|  | Dec 31, 19 |
|---|---|
|  | 74,239.82 |
|  | 100,000.00 |
|  | 25,000.00 |
|  | 25,000.00 |
|  | 100,000.00 |
|  | 25,000.00 |
|  | 25,000.00 |
|  | 25,000.00 |
|  | 200,000.00 |
|  | 100,000.00 |
|  | 35,000.00 |
|  | 25,000.00 |
|  | 50,000.00 |
|  | 100,000.00 |
|  | 200,000.00 |
|  | 50,000.00 |
|  | 100,000.00 |
| **Net Income** | -2,046,567.17 |
| **Total Equity** | 4,265,483.16 |
| **TOTAL LIABILITIES & EQUITY** | 5,698,917.90 |

# EXHIBIT B

Handwritten note: *7/1/22 – 4/30/22*

| A | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|--------|--------|--------|--------|--------|
| **Revenue** | | | | | |
| ACG Hospital Guidline Subscription | $ 300,000 | $ 7,500,000 | $ 75,000,000 | $ 150,000,000 | $ 300,000,000 |
| ACG Physician Per Use Revenue | | $ 10,000,000 | $ 50,000,000 | $ 100,000,000 | $ 200,000,000 |
| ACG ACO TPA Management Revenue | $ 1,000,000 | $ - | | $ 72,000,000 | $ 360,000,000 |
| ACG Hospital Integrated System Subscription | $ - | $ - | $ 30,000,000 | $ 300,000,000 | $ 3,000,000,000 |
| | | | | | |
| **ACG P&L Highlights** | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Total Revenue | $ 1,300,000 | $ 17,500,000 | $ 155,000,000 | $ 622,000,000 | $ 3,860,000,000 |
| Cost Of Revenue | $ 260,000 | $ 3,500,000 | $ 31,000,000 | $ 124,400,000 | $ 772,000,000 |
| Gross Profit | $ 1,040,000 | $ 14,000,000 | $ 124,000,000 | $ 497,600,000 | $ 3,088,000,000 |
| Total Expenses | $ 7,000,000 | $ 9,025,000 | $ 82,150,000 | $ 329,660,000 | $ 2,045,800,000 |
| EBITDA | $ (5,960,000) | $ 4,975,000 | $ 41,850,000 | $ 167,940,000 | $ 1,042,200,000 |

**ACG Revenues**

Chart axis values: $- , $1,000,000,000 , $2,000,000,000 , $3,000,000,000 , $4,000,000,000 across Year 1, Year 2, Year 3, Year 4, Year 5

Legend:
- ACG Hospital Guidline Subscription
- ACG Physician Per Use Revenue
- ACG ACO TPA Management Revenue
- ACG Hospital Integrated System Subscription

**ACG P&L**

Chart axis values: $(1,000,000,000) , $- , $1,000,000,000 , $2,000,000,000 , $3,000,000,000 , $4,000,000,000 , $5,000,000,000 across Year 1, Year 2, Year 3, Year 4, Year 5

Legend:
- Total Revenue
- Cost Of Revenue
- Gross Profit
- Total Expenses
- EBITDA